IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEIRDRE CARROLL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. |
| | ) | |
| YMCA OF METRO CHICAGO LLC, an | ) | |
| Illinois limited liability company, and DAVID | ) | |
| RODRIGUEZ, | ) | |
| | ) | |
| Defendant. | ) | **JURY DEMANDED** |

## COMPLAINT

Plaintiff Deirdre Carroll, by her attorneys Favaro & Gorman, Ltd., pursuant to federal and state prohibitions against discrimination, harassment and retaliation in the workplace based on sex, national origin, ancestry, and disability, and invoking common law civil remedies for assault, battery, intentional infliction of emotional distress, and false imprisonment, complains of her former employer, YMCA of Metro Chicago LLC ("YMCA Metro"), and her former immediate supervisor, David Rodriguez, based on Rodriguez's relentless abuse of Carroll, and his merciless retaliation against her for her numerous, ultimately futile complaints to him and to YMCA Metro.

### Jurisdiction and Venue

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343 (civil rights); 28 U.S.C. § 1367 (supplemental jurisdiction); and 42 U.S.C. § 2000e-5(f)(3) (Title VII of the Civil Rights Act of 1964).

2.       Venue in this district is appropriate pursuant to 28 U.S.C. § 1391(b)(1), (2),

because the defendants are residents of this district and because the acts giving rise to Carroll's

claims occurred in this district, and pursuant to 42 U.S.C. § 2000e-5(f)(3)

## Procedural History

3.       Carroll filed a charge of discrimination, harassment and retaliation with the

Illinois Department of Human Rights on October 11, 2012.  The charge was cross-filed with the

U.S. Equal Employment Opportunity Commission.  A copy of the charge is attached as Exhibit 1

to this complaint.

4.       IDHR issued a Notice of Substantial Evidence on September 30, 2013. Exhibit 2.

5.       The EEOC issued a Notice of Right To Sue by Carroll's request on November 19,

2013. Exhibit 3.

6.       Carroll filed a second charge with IDHR, cross-filed with the EEOC, on March

21, 2013, alleging disability discrimination and retaliation. Exhibit 4.

7.       Carroll has requested a Notice Of Right To Sue for her March 21, 2013 charge.

## Parties

8.       Plaintiff Carroll, who was born in Ireland, is fifty-four years old and lives with her

husband in Chicago.  She was employed by defendant YMCA Metro as Member Relations

Director of its Lattof YMCA ("Lattof") facility in Des Plaines, Cook County, Illinois.

9.       Defendant YMCA Metro is an Illinois not-for-profit, limited liability corporation

headquartered in Chicago.  It maintains health and wellness facilities, camps, child care services,

and fine art programs in more than twenty facilities in the Chicago area.

10.      David Rodriguez is the executive director of Lattof, residing in Illinois.

## Nature of the Action

11.     Soon after Carroll began working at Lattof, her immediate superior, Rodriguez, began to sexually harass her by calling her into weekly, unnecessarily protracted meetings, where he would touch her, and subject her to verbal abuse.  Rodriguez also blatantly favored his subordinate male employees, granting them perks and sparing them the abuse he saved for his female employees. Carroll refused his advances and reported him several times to various Human Resource managers and other levels of management, including YMCA Metro's president/chief executive officer.  No one stopped Rodriguez, who retaliated with a vengeance, subjecting Carroll to more abuse, career sabotage, ethnic slurs, and oppressive working conditions. When Carroll was diagnosed with clinical emotional disorders resulting from Rodriguez's abuse, he intensified his campaign, and ultimately fired her.

### Rodriguez's Heavy Handed Sexual Aggression

12.     YMCA Metro's Employment Director hired Carroll in January 2010 for the position of Member Relations Director at Lattof.  The Employment Director instructed Carroll to report directly to Rodriguez.

13.     Soon after Carroll took the job, Rodriguez required her to participate in weekly private meetings with him.  The evening meetings took place behind closed doors in Rodriguez's office at Lattof.

14.     During the evening meetings, Rodriguez made inappropriate remarks to Carroll. Rodriguez told her that he really liked her, that he found her very attractive, and that he wished that his wife looked as attractive as Carroll.

15.     Rodriguez would make Carroll stay in his office with him for up to three hours at a time. He pulled his chair close to her, and often put his arm around her shoulders while he expressed his feelings.

16.     Paradoxically, Rodriguez would also question Carroll in detail about YMCA business and what had taken place during the week.  Rodriguez's intensity and physical proximity made Carroll feel as though she were being interrogated and berated.  She was afraid to object to the meetings or to protest Rodriguez's offensive behavior.

17.     Sometimes Rodriguez would sit, tap his pen on his desk, and stare at Carroll for up to thirty minutes without speaking. On other occasions, he would leave the room, and leave Carroll alone with nothing to do.

18.     If Carroll attempted to leave his office, Rodriguez told her to sit down, or stood in the doorway to block her exit. One time, he kept her in his office for several hours, much of which he spent just staring at her, tapping a pencil on his desk.

19.     Eventually during Rodriguez's weekly grilling, Carroll would become emotional and burst into tears.  At that point, Rodriguez began touching Carroll's arms, shoulders, legs.  He often held her hands, and rubbed the tops of her legs while she was seated next to him.

20.     Rodriguez often looked Carroll's body up and down, and frequently stared at her chest.  Other times, he stared at her face for fifteen to thirty minutes at a time.  Carroll felt intimidated and afraid to leave.

21.     From January 2010 through March, 2012 or later, Rodriguez repeatedly asked Carroll out for drinks and dinner.  Carroll believed Rodriguez's invitations occurred when his wife was out of town.

22.     In late January or early February, 2012, Rodriguez entered Carroll's office, sat down by her, and took her hand.  Carroll found the courage to tell him, "Don't touch me." Rodriguez said, "Come on, Dee," and "I just want to hold your hand."  Carroll replied, "I do not want you to talk, touch, sit close, or stare at me."

23.     From that point forward, Carroll repeatedly and forcefully told Rodriguez not to touch her, but he ignored her objections, persistently touching her against her wishes. Carroll viewed his behavior as unwelcome sexual advances.

24.     Occasionally, Rodriguez and Carroll attended business meetings away from Lattof.  Rodriguez would insist that Carroll ride with him, and once inside his car, he would touch and rub her arm.

25.     Once in March 2012, Rodriguez told Carroll to attend an offsite meeting with him.  Refusing her request to drive herself, Rodriguez insisted she ride with him.  After the meeting, Rodriguez did not drive back to Lattof.  Ignoring Carroll's demand to know his destination, Rodriguez drove to the Rosemont Casino and stopped the car.  Carroll became very nervous and afraid, asking "where are we going; what are we doing here, David?  David?" Rodriguez did not answer, but drove away instead.

**Rodriguez Responds To Rejection With Irish Slurs**

26.     When Carroll told Rodriguez early in 2012 not to touch her, Rodriguez began to insult her for being Irish. He told her that "Irish are drunks," "Irish people are not very smart; since you are Irish, you are not very smart, either," and "All of you Irish like to drink, get drunk and fight."

27.     In a meeting in February 2012 with Don Quinlan, a YMCA director of Irish descent, Carroll learned that Rodriguez had asked Quinlan about the characteristics of Irish

women and what they like. Soon after, Rodriguez told Carroll, "I know how you tick; I know how you work." He then commented on Irish people in general, and on Irish women in particular.

28.     Sometime around St. Patrick's Day 2012, Rodriguez told Carroll, "I'm sure you're going to get drunk tonight. All the Irish get drunk tonight when they go out."

### Rodriguez Gives His Boys Team All The Breaks
### Part 1, Fundraising

29.     Throughout Carroll's employment with YMCA Metro, Rodriguez treated his male employees better than he was treating her. Besides not subjecting them to multi-hour meetings involving inappropriate behavior, Rodriguez held her to higher standards than he did male directors. Rodriguez referred to his male employees as "the boys team."

30.     For example, department directors were required to establish fundraising campaigns. Rodriguez imposed fundraising goals on Carroll much greater than those of her male counterparts. In August 2011, Rodriguez demanded that Carroll bring in twelve corporate employee membership accounts in the next year. When Carroll protested that the goal was impossible, Rodriguez said, "you can't do your job," "you can't make your goals," and "maybe this is not the job for you." He continued, "Let me be crystal clear: you will do as I say." Carroll subsequently learned that the record for new employee accounts was one per year.

31.     Carroll was working twelve to thirteen hour days, up to seven days per week, while Rodriguez and male employees at her level were working normal business hours. In November 2011, Rodriguez told Carroll that she would be liaison to the Chamber of Commerce, required to attend four Chamber events each month. Carroll reminded him of the hours she was working at the Y, and asked him how she could manage the extra duties. Rodriguez's response was, "That's your problem."

6

32.     By December 2011, Carroll brought in three new employee accounts, but Rodriguez's verbal attacks about her progress continued. In contrast, Rodriguez did not berate male department heads about meeting fundraising goals. One male employee failed to participate in the fundraising without consequence.

33.     During the 2011 fall fundraising campaign, Rodriguez told Carroll to "make nice," "work your magic," and "put your girly stuff on and work your charms on the men." Carroll asked if he expected her to flirt with the men in order to reach her fundraising goals, and he replied, "Whatever works." When Carroll asked if he expected her male peers to do the same, Rodriguez said, "Of course not."

### Rodriguez Gives His Boys Team All The Breaks
### Part 2, Job Duties/Sanitary Working Conditions

34.     Rodriguez also forced Carroll to endure a miserable physical working environment. The carpet in her office contained mold and mouse droppings, and it was permeated with the stench of urine and vomit. The carpets in the offices of her male counterparts were in much better condition. Carroll asked Rodriguez to replace her carpet, but instead he replaced the carpet in the male directors' offices.

35.     When Rodriguez was absent from Lattof, he placed Tom March, the Aquatic Director, in charge of the facility. Carroll suggested more than once that the female directors at Lattof be put in a rotation with March to be in charge. Instead, when Rodriguez and March were both absent, Rodriguez appointed Kelly Giese, the male maintenance engineer who was lower in authority than the female directors, to be in charge.

36.     Rodriguez confirmed his bias by making sexist comments during director meetings: "The boys on my team understand me," "Women are high drama," and "Tom and Kelly (both males) – the boys team – understand me."

37. Rodriguez once told Carroll that she was "too emotional," "disrespectful," and "high maintenance by comparison to the boys." He often remarked that he would "rather deal with the boys" than with Carroll and Melanie Unterfranz, another female director.

38. In December, Carroll learned four days before the talent show that she had produced was to take place, that Rodriguez had given Tom March the use of the room which had been reserved for Carroll's show. Rodriguez told her that he didn't care if she had to cancel the show, but Carroll found another, smaller room, and redesigned the show to fit the room.

39. The night of the show, Rodriguez told her fifteen minutes before curtain time that he was breaking his promise to emcee the show, and that Carroll would have to do it instead.

40. Also around December, 2011, Rodriguez fired Unterfranz and transferred her responsibility for summer camp marketing to Tom March. When March failed to take action, Rodriguez waited until the last minute, the beginning of April, 2012, to order Carroll to take over the marketing for that summer's camp programs.

41. In January, 2012, in spite of Carroll regularly working twelve and thirteen hour days and not having a day off in two weeks, Rodriguez denied her request to take one single vacation day.

42. In March 2012, Carroll told Rodriguez that the toilet seats in the women's bathroom needed to be replaced, and showed him photos of the seats to demonstrate their terrible condition. Rodriguez asked, "Did you run your hand around the rim of the toilet to see if there was poop?" Astounded, Carroll asked if that is something that Rodriguez would ask Kelly Giese, the male building engineer to do, and Rodriguez responded, "No, it is what I am asking you to do." Unbelieving, Carroll asked him why, and Rodriquez said, "Because you are a girl."

**Rodriguez's Overt Career Sabotage**

43.     Rodriguez found other ways to retaliate against Carroll, beyond insulting her for being Irish.  After Carroll rejected his advances, Rodriguez began to sabotage her career with the YMCA. In late March 2012, Rodriguez told Carroll in front of the other directors that he was taking away her responsibility for producing Lattof's program guide, one of her primary job duties.

44.     In order to minimize her effectiveness, Rodriguez began to exclude Carroll from many meetings that she previously attended, and denied Carroll's repeated requests to attend training classes that would have enabled her to advance within the YMCA organization.

45.     Rodriguez stepped up his campaign against Carroll by giving her a negative performance review dated May 17, 2012.

46.     Carroll stood up to Rodriguez's plan of attack, and told him, "This is the start of your paper trail.  You're setting me up to fire me."  She told Rodriguez that he was treating her like he did Lattof's other female directors, Melanie Unterfranz and Alicia Phillips, before he fired them. Rodriguez replied, "I'll give you one thing, you can take a lot of abuse."

**Throughout Carroll's Employment, YMCA Metro's Management Let Her Knock Herself Out Reporting Rodriguez's Outrageous Behavior**

47.     When she first realized that Rodriguez was not going to voluntarily correct his misbehavior, Carroll reported his conduct to YMCA administration.

48.      On November 29, 2010, she met with Alicia Eddy, YMCA Metro's Human Resources Manager, at the Des Plaines public library to report the abuse that Rodriguez was inflicting on her.

49.     In February 2011, Carroll sent an e-mail to Charmaine Williams, YMCA Metro's Vice President of Human Resources, to report her mistreatment at the hands of Rodriguez.

9

50.     Carroll and Unterfranz then met with Williams to report how Rodriguez was treating them, including his favoritism, his three hour captive meetings, and his misleading financial reporting.  Williams told them to trust her, but that she would not meet with them again "out of respect" for Rodriguez.

51.     Between March and the mid-May, 2011, Carroll continued to report the way Rodriguez was treating her to Kathy Bosco, Regional Vice President.

52.     Carroll complained again about Rodriguez in an e-mail to Bosco on December 10, 2011.

53.     On December 21, 2011, fed up with Rodriguez's abuse which at that point had degenerated to Rodriguez giving her the silent treatment, Carroll called Richard Malone, president and chief executive officer of YMCA Metro, and told him she quit. Malone told her not to go anywhere, and that he would call Bosco.  Relying on Malone, Carroll continued to work at Lattof.

54.     YMCA Metro management did nothing to help, so Carroll continued to endure Rodriguez's sexual harassment, insults and attacks on her career because she was afraid that she would suffer the same fate as his other victims, Unterfranz and Phillips, and lose her job. However, when Rodriguez gave her a bad performance review, she complained to Jill Doerner, the Suburban North Group Vice President for YMCA Metro.

### The Abuse Makes Carroll Ill – Resulting In More Abuse And The Denial Of A Reasonable Accommodation

55.     On May 22, 2012, the hostile environment she had suffered at work caused Carroll to take a medical leave of absence. Carroll was diagnosed with Post Traumatic Stress Disorder as a result of the conduct alleged above.  She retained counsel, who informed YMCA Metro about her diagnosis and that she would be bringing charges, and she returned to work.

When YMCA Metro learned that she would be bringing charges, she was placed on a leave of absence while YMCA Metro investigated.

56.     Carroll returned to work September 24, 2012, and YMCA Metro immediately scheduled her to work seven days a week, including evenings Monday through Friday.  Carroll said that she could not comply with that schedule, so her schedule was marginally reduced by letting her take every other Friday off.  None of the male employees worked that many hours.

57.     Immediately upon Carroll's return, Rodriguez told other employees that she needed to be fired. He then put Carroll on a performance improvement plan.

58.     Rodriguez, March, and Giese said that Carroll was "a nut job" and "crazy."

59.     Rodriguez told other employees that Carroll was going to sue the YMCA, causing them to ostracize her.

60.     Carroll filed a charge of discrimination with IDHR on October 5, 2012.

61.     Carroll's doctor prepared a letter to Rodriguez and Alicia Eddy, Human Resources Manager, on October 16, 2012, recommending that Carroll work a five day, forty hour week, with two consecutive days off, because of her stress and anxiety level.  Rodriguez and Eddy denied the doctor's recommendation.

62.     On October 16, 2012, Carroll complained to Marsha McKenna, Director of the YMCA Membership Cabinet, about the oppressive hours Rodriguez required of her, despite her doctor's request for an accommodation.

63.     On October 18, 2012, Carroll reported to Eddy that Rodriguez had his arm around a female employee who seemed uncomfortable.  On October 22, 2012, Rodriguez and Eddy wrote up disciplinary reports on Carroll. They wrote her up again on October 23, 2012, after

Carroll observed Rodriguez subjecting another female employee to sexually suggestive conduct, and reported the incident to Eddy. The write-up accused Carroll of being insubordinate.

64.     An employee told Carroll on October 24, 2012 that Rodriguez approached her and another female co-worker, trying to persuade them to write a report stating that Carroll was abusive and disrespectful.

65.     Carroll disclosed to Rodriguez and Eddy on October 23, 2012 that she had Attention Deficit Hyperactivity Disorder.

### Rodriguez Fabricates A Lame Excuse To Fire Carroll

66.     On December 11, 2012, Rodriguez fired Carroll, in the presence of Human Resource Manager Alicia Eddy. Rodriguez gave her no reason other than a reference to an incident that had occurred two months earlier.

67.     The incident involved a member who had felt dizzy in the men's locker room after using the whirlpool. Carroll and Lattof's designated first responders, two lifeguards, attended to the gentleman, who refused treatment and left.

68.     Rodriguez's excuse for firing Carroll was obviously a pretext for illegal discrimination and retaliation, because he did not fire March when another member died of a heart attack after March refused to administer an automatic electronic defibrillator device.

69.     As Carroll said goodbye to other staff members, Eddy pushed her out the door.

### Count 1 - Title VII – Against YMCA Metro
### Sexual Harassment – Hostile Environment

70.     Paragraphs 1 through 69 are incorporated by reference.

71.     Title VII prohibits an employer from discriminating against an employee on the basis of sex, which includes maintaining a hostile environment in the form of sexual harassment.

72.     YMCA Metro maintained a hostile environment caused by Rodriguez's sexual harassment of Carroll, including but not limited to his unwanted touching, comments, and confinement of Carroll, against her wishes.

73.     YMCA Metro violated Title VII by maintaining a hostile environment in the form of sexual harassment.

74.     YMCA Metro's violation of Title VII was willful and in reckless disregard of Carroll's rights.

75.     As the direct result of YMCA Metro's violation of Title VII, Carroll suffered damage to her career, severe emotional distress, humiliation, pain and suffering.

### Count 2 –Illinois Human Rights Act– Against YMCA Metro
### Sexual Harassment – Hostile Environment

76.     Paragraphs 1 through 69 are incorporated by reference.

77.     The Illinois Human Rights Act prohibits an employer from discriminating against an employee based on sex, which includes maintaining a hostile environment in the form of sexual harassment.

78.     YMCA Metro maintained a hostile environment caused by Rodriguez's sexual harassment of Carroll, including but not limited to his unwanted touching, comments, and confinement of Carroll, against her wishes.

79.     YMCA Metro's hostile environment violated the IHRA.

80.     As the direct result of YMCA Metro's violation of the IHRA, Carroll suffered damage to her career, severe emotional distress, humiliation, pain and suffering.

### Count 3 – Title VII– Against YMCA Metro
### Sexual Harassment– Quid Pro Quo

81.     Paragraphs 1 through 69 are incorporated by reference.

13

82.    Title VII prohibits an employer from discriminating against an employee on the basis of sex, which includes altering the terms and conditions of employment in order to seek sexual favors.

83.    YMCA Metro altered the terms and conditions of Carroll's employment caused by Rodriguez's attacks on her career in the course of his seeking sexual favors from her, such as preventing her from doing her job, denying her training, denying her favorable assignments, fabricating poor performance reviews, and ultimately terminating her employment.

84.    YMCA Metro's discrimination in the form of Rodriguez's quid pro quo harassment of Carroll violated Title VII.

85.    YMCA Metro's violation of Title VII was willful and in reckless disregard of Carroll's rights.

86.    As the direct result of YMCA Metro's violation of Title VII, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

### Count 4 – Illinois Human Rights Act– Against YMCA Metro
### Sexual Harassment - Quid Pro Quo

87.    Paragraphs 1 through 69 are incorporated by reference.

88.    The IHRA prohibits an employer from discriminating against an employee on the basis of sex, which includes altering the terms and conditions of employment in order to seek sexual favors.

89.    YMCA Metro altered the terms and conditions of Carroll's employment caused by Rodriguez's attacks on her career in the course of his seeking sexual favors from her, such as preventing her from doing her job, denying her training, denying her favorable assignments, fabricating poor performance reviews, and ultimately terminating her employment.

14

90. YMCA Metro's discrimination in the form of Rodriguez's quid pro quo harassment of Carroll violated the IHRA.

91. As the direct result of YMCA Metro's violation of the IHRA, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

**Count 5 – Title VII – Against YMCA Metro**
**Retaliation – Sexual Harassment**

92. Paragraphs 1 through 69 are incorporated by reference.

93. Title VII prohibits an employer from retaliating against an employee for opposing or reporting hostile environment and quid pro quo sexual harassment.

94. YMCA Metro through Rodriguez and other management personnel retaliated against Carroll because she refused Rodriguez's sexual harassment and reported it to all levels of management.

95. The retaliation by Rodriguez and YMCA Metro took the form of preventing her from doing her job, demeaning her in private and before others, verbally abusing her, denying her training, denying her favorable assignments, fabricating poor performance reviews, alienating her co-workers, and ultimately terminating her employment.

96. YMCA Metro's retaliation against Carroll violated Title VII.

97. YMCA Metro's violation of Title VII was willful and in reckless disregard of Carroll's rights.

98. As the direct result of YMCA Metro's violation of Title VII, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

## Count 6 – Title VII – Against YMCA Metro
### Sex Discrimination

99.    Paragraphs 1 through 69 are incorporated by reference.

100.    Title VII prohibits an employer from discriminating against an employee by altering the terms and conditions of her employment based on her sex.

101.    YMCA Metro altered the terms and conditions of Carroll's employment because she is female by giving her less favorable working conditions then male employees, by denying her training opportunities, by holding her to higher standards than male employees, by sabotaging her career and by terminating her employment.

102.    YMCA Metro's discrimination against Carroll because she is female violated Title VII.

103.    YMCA Metro's violation of Title VII was willful and in reckless disregard of Carroll's rights.

104.    As the direct result of YMCA Metro's violation of Title VII, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

## Count 7 - Title VII– Against YMCA Metro
### Sex Discrimination – Hostile Environment

105.    Paragraphs 1 through 69 are incorporated by reference.

106.    Title VII prohibits an employer from discriminating against an employee on the basis of sex, which includes maintaining a hostile environment toward women.

107.    YMCA Metro favored male employees over Carroll in the terms and conditions of her employment caused by Rodriguez's attacks on her career, such as preventing her from doing

her job, denying her training, denying her favorable assignments, fabricating poor performance reviews, and ultimately terminating her employment.

108.    YMCA Metro's sex discrimination violated Title VII.

109.    YMCA Metro's violation of Title VII was willful and in reckless disregard of Carroll's rights.

110.    As the direct result of YMCA Metro's violation of Title VII, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

### Count 8 – Title VII – Against YMCA Metro
### Retaliation – Sex Discrimination

111.    Paragraphs 1 through 69 are incorporated by reference.

112.    Title VII prohibits an employer from retaliating against an employee for opposing or reporting discrimination based on an employee's sex.

113.    YMCA Metro through Rodriguez and other management personnel retaliated against Carroll because she opposed Rodriguez's discrimination based on her sex and because she reported it to all levels of management.

114.    The retaliation by Rodriguez and YMCA Metro took the form of preventing her from doing her job, demeaning her in private and before others, verbally abusing her, denying her training, denying her favorable assignments, fabricating poor performance reviews, alienating her co-workers, and ultimately terminating her employment.

115.    YMCA Metro's retaliation against Carroll violated Title VII.

116.    YMCA Metro's violation of Title VII was willful and in reckless disregard of Carroll's rights.

117.    As the direct result of YMCA Metro's violation of Title VII, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

### Count 9 – Illinois Human Rights Act – Against YMCA Metro
### Sex Discrimination

118.    Paragraphs 1 through 69 are incorporated by reference.

119.    The IHRA prohibits an employer from discriminating against an employee on the basis of sex.

120.    YMCA Metro favored male employees over Carroll in the terms and conditions of her employment caused by Rodriguez's attacks on her career, such as preventing her from doing her job, denying her training, denying her favorable assignments, fabricating poor performance reviews, and ultimately terminating her employment.

121.    YMCA Metro's sex discrimination violated the IHRA.

122.    As the direct result of YMCA Metro's violation of Title VII, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering

### Count 10 – Title VII– Against YMCA Metro
### National Origin And Ancestry Discrimination – Hostile Environment

123.    Paragraphs 1 through 69 are incorporated by reference.

124.    Title VII prohibits an employer from discriminating against an employee by maintaining a hostile environment based on either her national origin or her ancestry.

125.    YMCA Metro maintained a hostile environment because Rodriguez continually ridiculed Carroll for being from Ireland and for being of Irish descent.

126.    YMCA Metro's hostile environment violated Title VII.

127.    YMCA Metro's violation of Title VII was willful and in reckless disregard of Carroll's rights.

128.    As the direct result of YMCA Metro's violation of Title VII, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

### Count 11 – Illinois Human Rights Act -- Against YMCA Metro
### National Origin And Ancestry Discrimination – Hostile Environment

129.    Paragraphs 1 through 69 are incorporated by reference.

130.    The IHRA prohibits an employer from discriminating against an employee by maintaining a hostile environment based on either her national origin or her ancestry.

131.    YMCA Metro maintained a hostile environment because Rodriguez continually ridiculed Carroll for being from Ireland and for being of Irish descent.

132.    YMCA Metro's hostile environment violated the IHRA.

133.    As the direct result of YMCA Metro's violation of the IHRA, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

### Count 12 – ADA– Against YMCA Metro
### Disability Discrimination

134.    Paragraphs 1 through 69 are incorporated by reference.

135.    The Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.*, prohibits an employer from discriminating against an employee who is a qualified individual with a disability in the terms and conditions of her employment.

136.    Carroll is a qualified individual with a disability due to her conditions of Post-Traumatic Stress Disorder and Attention Deficit Hyperactivity Disorder.

19

137.    YMCA Metro discriminated against Carroll in the terms and conditions of her employment by denying her reasonable accommodations, giving her less favorable working conditions then non-disabled employees, holding her to higher standards than non-disabled employees, sabotaging her career and terminating her employment.

138.    YMCA Metro's discrimination against of Carroll because she is disabled violated the ADA.

139.    YMCA Metro's violation of the ADA was willful and in reckless disregard of Carroll's rights.

140.    As the direct result of YMCA Metro's violation of the ADA, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

**Count 13 – Illinois Human Rights Act– Against YMCA Metro**
**Handicap Discrimination**

141.    Paragraphs 1 through 69 are incorporated by reference.

142.    The IHRA prohibits an employer from discriminating against an employee   in the terms and conditions of her employment based on a handicap.

143.    Carroll's conditions of Post Traumatic Stress Disorder and Attention Deficit Hyperactivity Disorder are handicaps.

144.    YMCA Metro discriminated against Carroll in the terms and conditions of her employment by denying her reasonable accommodations, giving her less favorable working conditions than non-disabled employees, holding her to higher standards than non-disabled employees, sabotaging her career and terminating her employment.

145.    YMCA Metro's discrimination against of Carroll because she is disabled violated the IHRA.

20

146.    As the direct result of YMCA Metro's violation of the IHRA, Carroll suffered the

loss of compensation and benefits, damage to her career, severe emotional distress, humiliation,

pain and suffering.

### Count 14 – ADA– Against YMCA Metro
### Disability Discrimination – Hostile Environment

147.    Paragraphs 1 through 69 are incorporated by reference.

148.    The ADA prohibits an employer from discriminating against a qualified

individual with a disability by maintaining a hostile environment.

149.    YMCA Metro, by Rodriguez, maintained a hostile environment by ridiculing

Carroll, subjecting her to adverse working conditions, sabotaging her employment, and causing

her co-workers to ostracize her.

150.    YMCA Metro's hostile environment violated the ADA.

151.    YMCA Metro's violation of the ADA was willful and in reckless disregard of

Carroll's rights.

152.    As the direct result of YMCA Metro's violation of the ADA, Carroll suffered the

loss of compensation and benefits, damage to her career, severe emotional distress, humiliation,

pain and suffering.

### Count 15 – Illinois Human Rights Act– Against YMCA Metro
### Handicap Discrimination – Hostile Environment

153.    Paragraphs 1 through 69 are incorporated by reference.

154.    The IHRA prohibits an employer from discriminating against an employee with a

handicap by maintaining a hostile environment.

155.     YMCA Metro, by Rodriguez, maintained a hostile environment by ridiculing Carroll, subjecting her to adverse working conditions, sabotaging her employment, and causing her co-workers to ostracize her.

156.     YMCA Metro's hostile environment violated the IHRA.

157.     YMCA Metro's violation of the IHRA was willful and in reckless disregard of Carroll's rights.

158.     As the direct result of YMCA Metro's violation of the IHRA, Carroll suffered the loss of compensation and benefits, damage to her career, severe emotional distress, humiliation, pain and suffering.

**Count 16 – Against David Rodriguez**
**Intentional Infliction Of Emotional Distress**

159.     Paragraphs 1 through 69 are incorporated by reference.

160.     Rodriguez knew or should have known that his actions, and those of the employees, had a high probability of causing Carroll extreme emotional distress.

161.     As a result of Rodriguez's actions, Carroll suffered injuries including but not limited to pain and suffering, emotional distress, anguish and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

162.     Such actions included trapping her in his office, touching her inappropriately, sabotaging her assignments, forcing her to ride with him to events in order to touch her inappropriately, verbally abusing her and making her to endure substandard and unsanitary working conditions while insulting her and making jokes at her expense.

163.     As the direct result of Rodriguez's malicious actions, Carroll suffered and continues to suffer extreme emotional distress, humiliation, pain and suffering.

## Count 17 – Against YMCA Metro
### Intentional Infliction Of Emotional Distress

164.     Paragraphs 1 through 69 are incorporated by reference.

165.     Rodriguez, while acting within the scope of his employment and advancing YMCA Metro's business interests, knew or should have known that his actions, and those of the employees, had a high probability of causing Carroll extreme emotional distress.

166.     As the direct result of Rodriguez's actions, Carroll suffered injuries including but not limited to pain and suffering, emotional distress, anguish and experienced great humiliation and embarrassment and continues to suffer great pain and distress.

167.     Such actions included trapping her in his office, touching her inappropriately, sabotaging her assignments, forcing her to ride with him to events in order to touch her inappropriately, verbally abusing her and making her to endure substandard and unsanitary working conditions while insulting her and making jokes at her expense.

168.     YMCA Metro is responsible for Rodriguez's actions under the doctrine of respondeat superior.

169.     As the direct result of Rodriguez's malicious actions, Carroll suffered and continues to suffer extreme emotional distress, humiliation, pain and suffering.

## Count 18 – Against David Rodriguez
### Assault

170.     Paragraphs 1 through 69 are incorporated by reference.

171.     Rodriguez caused Carroll to fear and reasonably apprehend that he would physically hurt her because of his repeated offensive touching.

172.     As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

23

### Count 19 – Against David Rodriguez
### Assault – Punitive Damages

173. Paragraphs 1 through 69 are incorporated by reference.

174. Rodriguez caused Carroll to fear and reasonably apprehend that he would physically hurt her because of his repeated offensive touching.

175. Rodriguez's actions were willful and wanton, and in reckless disregard of Carroll's well-being.

176. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 20 – Against YMCA Metro
### Assault

177. Paragraphs 1 through 69 are incorporated by reference.

178. While acting within the scope of his employment and advancing the business interests of YMCA Metro, Rodriguez caused Carroll to fear and reasonably apprehend that he would physically hurt her because of his repeated offensive touching.

179. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

180. YMCA Metro is responsible for Rodriguez's actions under the doctrine of respondeat superior.

181. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 21 – Against YMCA Metro
### Assault – Punitive Damages

182. Paragraphs 1 through 69 are incorporated by reference.

183. While acting within the scope of his employment and advancing the business interests of YMCA Metro, Rodriguez caused Carroll to fear and reasonably apprehend that he would physically hurt her because of his repeated offensive touching.

184. Rodriguez's actions were willful and wanton, and in reckless disregard of Carroll's well-being.

185. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

186. YMCA Metro is responsible for Rodriguez's actions under the doctrine of respondeat superior.

187. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 22 – Against David Rodriguez
### Battery

188. Paragraphs 1 through 69 are incorporated by reference.

189. On multiple occasions, Rodriguez intentionally and willfully made physical contact with Carroll without provocation, justification, consent or authorization.

190. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 23 – Against David Rodriguez
### Battery – Punitive Damages

191. Paragraphs 1 through 69 are incorporated by reference.

192. On multiple occasions, Rodriguez intentionally and willfully made physical contact with Carroll without provocation, justification, consent or authorization.

193. Rodriguez's actions were willful and wanton, and in reckless disregard of Carroll's well-being.

194. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 24 – Against YMCA Metro
### Battery

195. Paragraphs 1 through 69 are incorporated by reference.

196. On multiple occasions, while acting within the scope of his employment and advancing the business interests of YMCA Metro, Rodriguez intentionally and willfully made physical contact with Carroll without provocation, justification, consent or authorization.

197. YMCA Metro is responsible for Rodriguez's actions under the doctrine of respondeat superior.

198. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 25 – Against YMCA Metro
### Battery – Punitive Damages

199. Paragraphs 1 through 69 are incorporated by reference.

200. On multiple occasions, while acting within the scope of his employment and advancing the business interests of YMCA Metro, Rodriguez intentionally and willfully made physical contact with Carroll without provocation, justification, consent or authorization.

201. YMCA Metro is responsible for Rodriguez's actions under the doctrine of respondeat superior.

202. Rodriguez's actions were willful and wanton, and in reckless disregard of Carroll's well-being.

203.     As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 26 – Against David Rodriguez
### False Imprisonment (Automobile)

204.     Paragraphs 1 through 69 are incorporated by reference.

205.      On multiple occasions, Rodriguez unlawfully restrained Carroll against her will by confining her in his automobile.

206.     Carroll had no reasonable means of escaping from the confines of Rodriguez' automobile.

207.     As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 27 – Against David Rodriguez
### False Imprisonment (Automobile) – Punitive Damages

208.     Paragraphs 1 through 69 are incorporated by reference.

209.     On multiple occasions, Rodriguez unlawfully restrained Carroll against her will by confining her in his automobile.

210.     Carroll had no reasonable means of escaping from the confines of Rodriguez' automobile.

211.     Rodriguez's actions were willful and wanton, and in reckless disregard of Carroll's well-being.

212.     As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 28 – Against YMCA Metro
### False Imprisonment (Automobile)

213.     Paragraphs 1 through 69 are incorporated by reference.

27

214.    On multiple occasions, while acting with the scope of his employment and advancing the business interests of YMCA Metro, Rodriguez unlawfully restrained Carroll against her will by confining her in his automobile.

215.    Carroll had no reasonable means of escaping from the confines of Rodriguez' automobile.

216.    YMCA Metro is responsible for Rodriguez's actions under the doctrine of respondeat superior.

217.    As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

**Count 29 – Against YMCA Metro**
**False Imprisonment (Automobile) – Punitive Damages**

218.    Paragraphs 1 through 69 are incorporated by reference.

219.    On multiple occasions, while acting with the scope of his employment and advancing the business interests of YMCA Metro, Rodriguez unlawfully restrained Carroll against her will by confining her in his automobile.

220.    Carroll had no reasonable means of escaping from the confines of Rodriguez' automobile.

221.    Rodriguez's actions were willful and wanton, and in reckless disregard of Carroll's well-being.

222.    YMCA Metro is responsible for Rodriguez's actions under the doctrine of respondeat superior.

223.    As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 30 – Against David Rodriguez
### False Imprisonment (Office)

224.    Paragraphs 1 through 69 are incorporated by reference.

225.    On multiple occasions, Rodriguez unlawfully restrained Carroll against her will by confining her in his office.

226.    Carroll had no reasonable means of escaping from the confines of Rodriguez's office.

227.    As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 31 – Against David Rodriguez
### False Imprisonment (Office) – Punitive Damages

228.    Paragraphs 1 through 69 are incorporated by reference.

229.    On multiple occasions, Rodriguez unlawfully restrained Carroll against her will by confining her in his office.

230.    Carroll had no reasonable means of escaping from the confines of Rodriguez's office.

231.    Rodriguez's actions were willful and wanton, and in reckless disregard of Carroll's well-being.

232.    As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 32 – Against YMCA Metro
### False Imprisonment (Office)

233.    Paragraphs 1 through 69 are incorporated by reference.

234. On multiple occasions, while acting with the scope of his employment and advancing the business interests of YMCA Metro, Rodriguez unlawfully restrained Carroll against her will by confining her in his office.

235. Carroll had no reasonable means of escaping from the confines of Rodriguez's office.

236. YMCA Metro is responsible for Rodriguez's actions under the doctrine of respondeat superior.

237. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

### Count 33 – Against David Rodriguez
### False Imprisonment (Office) – Punitive Damages

238. Paragraphs 1 through 69 are incorporated by reference.

239. On multiple occasions, while acting with the scope of his employment and advancing the business interests of YMCA Metro, Rodriguez unlawfully restrained Carroll against her will by confining her in his office.

240. Carroll had no reasonable means of escaping from the confines of Rodriguez's office.

241. YMCA Metro is responsible for Rodriguez's actions under the doctrine of respondeat superior.

242. Rodriguez's actions were willful and wanton, and in reckless disregard of Carroll's well-being.

243. As the direct result of Rodriguez's actions, Carroll suffered emotional distress, humiliation, pain and suffering.

Wherefore, plaintiff Deirdre Carroll requests that the Court enter judgment in her favor against defendants YMCA of Metro Chicago LLC and David Rodriguez, awarding her:

A. Damages for lost compensation and benefits;

B. Front pay for a reasonable period;

C. Damages for emotional distress, humiliation, pain and suffering;

D. Punitive damages in excess of $1,000,000;

E. Her attorneys' fees; and

F. The costs of this action.

## JURY DEMAND

Plaintiff Carroll demands a trial by jury.


*s/ Dennis R. Favaro*
One of Plaintiff's Attorneys

Dennis R. Favaro
Patrick J. Gorman
Andrew H. Haber
Patricia L. Jochum
Favaro & Gorman, Ltd.
835 Sterling Avenue
Suite 100
Palatine, Illinois 60067

#13M1011.06

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 2013CF1026 |
| ✓ IDHR | |

**Illinois Dept. of Human Rights** and EEOC
_State or local Agency, if any_

| NAME (indicate Mr., Ms, or Mrs.) | HOME TELEPHONE (include area code) |
|---|---|
| Mrs. Deirdre Carroll | (847) 907-1939 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1350 Oak Hill Road, Lake Barrington, Illinois 60010 | | Reducted |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (if more than one list below.)

| NAME YMCA of Metro Chicago | NUMBERS OF EMPLOYEES, MEMBERS 15+ | TELEPHONE NUMBER (Include Area Code) (847) 296-3376 |
|---|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 300 East Northwest Highway, Des Plaines, Illinois 60016 | | Cook |

| NAME | TELEPHONE NUMBER (Include area code) |
|---|---|

| STREET ADDRESS | CITY, STATE, AND ZIP CODE | COUNTY |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (check appropriate box(es))

☐ RACE  ☐ COLOR  ✓ SEX  ☐ RELIGION  ✓ NATIONAL ORIGIN / Ancestry

✓ RETALIATION  ☐ AGE  ☐ DISABILITY  ✓ OTHER (SPECIFY)

DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA) LATEST (ALL)

**January, 2010 – present**

✓ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet (s)):

Dept. of Human Rights

OCT 1 7 2012

Intake Division

OFFICIAL SEAL
NICOLA MICHEL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/05/16

| ✓ I also want this charge filed with the Equal Employment Opportunity Commission. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedure. | NOTARY (Necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that is true to the best of my knowledge, information and belief. |

I declare under penal... true and correct.

**EXHIBIT**

Notary Signature &

SIGNATURE OF COMPLAINANT     DATE 10/5/12

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (day, month, and year)

5th day of October 2012

**Deirdre Carroll v. YMCA of Metro Chicago**

I.    A.    **ISSUE/BASIS**

**SEXUALLY HARASSED FROM AT LEAST JANUARY, 2010 THROUGH MAY, 2012.**

B.    **PRIMA FACIE ALLEGATIONS**

1.    I was hired by Respondent in January 2010.

2.    My most recent position is that of Membership Director, Lattof YMCA.

3.    At all times relevant hereto, I met the reasonable performance expectations of Respondent.

4.    My immediate supervisor's name was David Rodriguez , Director Lattof YMCA.

5.    Beginning in or around January 2010 through May 2012, Rodriguez would hold closed door evening meetings with me.  These meetings generally occurred on a weekly basis.  During these meetings Rodriguez made statements to me including but not limited to the following:

- How much he really liked me;
- How attractive I was;
- Wishing his wife looked as attractive as me;
- Complimenting me on my attractive appearance;
- Describing his sexual relations or lack thereof with his wife.

6.    The foregoing meetings lasted up to  three (3) hours in length during which Rodriguez would engage in behavior including but not limited to the following:

- Pulling his chair close to where I was seated;
- Putting his arm around my shoulders; and physically touched me;
- Grabbing and holding my hands;
- Rubbed the top of my legs when he was seated next to me;
- Stared at my body in an up and down matter;
- Stared at my breasts.

7.    On some occasions during my meetings with Rodriguez, I felt I was being subjected to an interrogation which resulted in my breaking down in tears.  When I became emotional, Rodriguez would then express niceties to me, and try to embrace or otherwise touch me.

Deirdre Carroll v. YMCA of Metro Chicago

8.     At times during the meetings. Rodriguez would not speak to me at all for up to thirty minutes. Instead, he would just stare at me without speaking.

9.     I was afraid to leave these meetings. so I remained. On the few occasions when I attempted to leave, Rodriguez told me loudly "sit" or "sit down".

10.     In or around January/February 2012 during one of the office meetings between myself and Rodriguez, he sat down next to me, and he took my hand in his. I told him not to touch me. He responded with "come on Dee. I just want to hold your hand". In response, I stated that I do not want you to talk, touch, sit close to me. or stare at me."

11.     Thereafter, I objected each time he attempted to touch me, but it did not stop his conduct toward me.

12.     During my employment, Rodriguez would insist that I ride in his vehicle to offsite meetings. Once I was inside his car, he would touch my hand and/or rub my arm.

13.     In March 2012, Rodriguez told me that I need to attend an offsite meeting. and he insisted I ride in his vehicle. He drove me to the Rosemont Casino. After I questioned why we were there. he never parked or exited the car. Instead. he drove back to the YMCA.

14.     Between January 2010 and March 2012, Rodriguez frequently asked me to go out for drinks or to dinner with him.

15.     The actions taken against me by Rodriguez were not welcomed. and I made that clear to him. Despite my complaints, his actions toward me did not stop.

16.     These actions created a hostile work environment and interfered with my ability to do my job in that I was very uncomfortable. I began experiencing anxiety. and I dreaded going to work.

17.     I believe I have been subjected to sexual harassment in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act. as amended.

<u>Deirdre Carroll v. YMCA of Metro Chicago</u>

II.    A.    **ISSUE/BASIS**

**RETALIATION FROM DECEMBER, 2011 TO MAY, 2012 DUE TO OBJECTING TO SEXUAL HARASSMENT.**

B.    **PRIMA FACIE ALLEGATIONS**

1.    Paragraphs 1 through 17 in IAB above are restated and realleged as though fully set forth herein.

2.    Throughout my employment and specifically between December 2011 and May 2012, I complained about the behavior and comments Rodriguez directed toward me on at least seven occasions to human resources, the Suburban North Group Vice President, the Regional Vice President of Human Resources, the Manager of Human Resources and the CEO / President of Respondent.

3.    Following my complaint to Kathy Bosco, Regional Vice President, in December 2011, Rodriguez retaliated against me in that he:

4.    Would ignore me when I spoke to him (on or about December 21, 2011).

5.    He would no longer permit me to participate in training classes necessary for advancement within the YMCA organization (starting late January 2012/early February 2012).

6.    Excluded me from meetings in which I formerly participated by either not informing me of them or directing me not to attend. Starting in late January 2012/early February 2012.

- Would not return my telephone calls related to member issues;
- Would not respond to my e-mails;
- Was hostile to me in front of staff;
- Would not respond to my questions;
- Gave me impossible staffing requirements which resulted in my inability to take a day off for 31 days;
- Did not turn in my nomination for a YMCA award.
- Relieved me of my Program Guide implementation duties (March 2012).
- Refused to allow me to serve on committees (May 2012)
- Scheduled meetings with me for which he did not appear. (May 2012)
- Refused to allow me to speak with other people in the association.

3

**Deirdre Carroll v. YMCA of Metro Chicago**

7. In May 2012, Rodriguez directed me to have another evening meeting with him. At that time, he remarked, "if I would do your mid-review now, it would not be favorable". When I inquired why, he responded, "because you do not do what I tell you to do."

8. Following my protests to Rodriguez, he began subjecting me to performance related criticism.

9. I was subjected to this behavior within a short period of time from the date I complained about and/or objected to sexual harassment thus raising an inference of retaliatory motivation.

10. Despite my complaints, Rodriguez behavior toward me did not stop.

11. I believe I have been subjected to retaliation in violation of the Illinois Human Rights Act and Title VII of the Civil Rights, as amended.

**III.    A.    ISSUE/BASIS**

**SUBJECTED TO DISCRIMINATION ON THE BASIS OF MY NATIONAL ORIGIN SINCE AT LEAST JANUARY, 2012**

**B.    PRIMA FACIE ALLEGATIONS**

1. I was born in Ireland, and I am of Irish ancestry.

2. Beginning in late January 2012/early February 2012 and following my stated objections to Rodriguez, Rodriguez began making comments to me including but not limited to:

- "Irish are drunks."
- "Irish people are not very smart."
- "Since you are Irish, you are not very smart either."
- "All of you Irish like to drink, get drunk and fight."
- "I'm sure you are going to get drunk tonight-all the Irish like to drink, get drunk and fight".(On or around March 17, 2012.)
- "I know how you tick-I know how you work." This was followed by commentary about Irish women and Irish people."

4

**Deirdre Carroll v. YMCA of Metro Chicago**

3.  I believe I have been subjected to discrimination on the basis of my national origin in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act of 1964, as amended.

IV.   A.   **ISSUE/BASIS**

**SUBJECTED TO DISCRIMINATION ON THE BASIS OF MY ANCESTRY SINCE AT LEAST JANUARY, 2012,**

B.   **PRIMA FACIE ALLEGATIONS**

1.  Paragraphs 1 – 3 in IIIAB are restated and realleged as though fully set forth herein.

2.  I believe I have been subjected to discrimination on the basis of my ancestry in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act of 1964, as amended.

V.   A.   **ISSUE/BASIS**

**DISCRIMINATION ON THE BASIS OF SEX (GENDER/FEMALE)**

B.   **PRIMA FACIE ALLEGATIONS**

1.  Paragraphs 1 through 17 IAB and paragraphs 1 – 11 of IIAB are restated and realleged as though fully set forth herein.

2.  My sex is female.

3.  At all times, I was performing my job duties in a manner which met the reasonable expectations of Respondent.

4.  During my employment with Respondent during 2010 and again in 2011, Rodriguez required management personnel at the Lattof YMCA to establish fundraising campaigns. Affiliated with this requirement, Rodriguez increased my production goals, and berated me for alleged lack of progress.

**Deirdre Carroll v. YMCA of Metro Chicago**

5.  Between October 2011 and December 2011, during the fundraising campaign, Rodriguez directed me to "make nice" and "work your magic" with male YMCA members. I inquired whether he was asking me to flirt with the men to reach the fundraising goals. His response was "whatever works". I further inquired whether he expected the same from the male management members, and his response was "of course not".

6.  I met and exceeded my fundraising goals.

7.  During this same period in connection with other YMCA promotions and recruitment, Rodriguez told me "put your girly stuff on and work your charms on the men", and "you know how to work it".

8.  Comparable comments were not made to my similarly situated male counterparts.

9.  In contrast, my similarly-situated male counterparts did not have their goals increased to the same extent and at least one of my male counterparts did not even participate in the fundraising campaign.

10. I informed Rodriguez that the carpet in my office contained mold, mouse droppings, and smelled of vomit and urine. Despite my repeated requests, he would not authorize the carpet to be replaced. However, he did authorize the replacement of the carpet of my similarly-situated male counterparts even though its condition was better than mine.

11. On or about December 7, 2011, Rodriguez told me I could no longer use the room he had assigned to me for a holiday talent show for staff and members which was scheduled to take place on December 11, 2011. I had been planning this event based on that space with Rodriguez knowledge since September 2011. I was informed he had reassigned the room to my male counterpart to hold a staff party which was being held on the same date and time.

12. At that time, I complained to Kathy Bosco, Regional Vice President.

13. Upon information and belief, during my employment and continuing up to May 2012 Rodriguez did not require my similarly-situated male counterparts to:

    • Participate in regular weekly meetings with him more than once a week;
    • Participate in regular meetings with him during the evening hours;
    • Participate in one on one meetings with him which lasted up to three / four hours.

<u>Deirdre Carroll v. YMCA of Metro Chicago</u>

14. Rodriguez subjected me to gender based comments and remarks including but not limited to:

- "The boys on my team understand me";
- "Women are high drama";
- "Tom and Kelly (both males) understand me."
- "They know how to do their jobs-they don't cause drama like you."
- You are "too emotional."
- You are "high maintenance by comparison to the boys".
- He would rather "deal with the boys".

15. In March 2012, I informed Rodriguez that the toilet seats in the women's restroom needed to be replaced, and she showed him photographs of same. He asked me if I had run my "hand around the toilet seat to see if there was poop". When I inquired whether he made Kelly Giese the male building engineer do likewise, he responded, "no, it is what I am asking you to do", and "because you are a girl".

16. In May 2012, Rodriguez denied my request to grant one of my female staff members a free lifetime membership. In contrast, he granted the request of my similarly -situated male counterpart's to grant one of his male staff members a lifetime free membership even though the female employee had been employed longer him.

I believe I have been subjected to discrimination on the basis of my sex (gender) in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act of 1964, as amended.



ILLINOIS DEPARTMENT OF
# Human Rights

Pat Quinn, Governor
Rocco J. Claps, Director

September 30, 2013

Patricia L. Jochum, Esq.
Favaro & Gorman, Ltd.
835 Sterling Avenue, Ste 100
Palatine, IL  60067

Matthew P. Kellam, Esq.
Matthew P. Kellam, Laner Muchin, Ltd.
515 North State Street, Suite 2800
Chicago, IL  60654

RE:  Deirdre Carroll VS YMCA of Metro Chicago, 2013CF1026

## NOTICE OF SUBSTANTIAL EVIDENCE AS TO COUNTS A thru E

YOU ARE HEREBY NOTIFIED, the Director has concluded that there is Substantial Evidence that a civil rights violation has been committed.

**Complainant must either:**

1)  Within thirty (30) days of receipt of the notice of Substantial Evidence, notify the Department in writing if you wish the Department to file a complaint with the Human Rights Commission ("Commission") pertaining to the allegation(s).  Your request should be sent to:  Chief Legal Counsel, Illinois Department of Human Rights, 100 W. Randolph St., Ste. 10-100, Chicago, IL 60601.

The Illinois Human Rights Act ("Act") permits the Department to conduct conciliation to give the parties an opportunity to settle the case before a complaint is filed with the Commission.  Conciliation is a process in which a Department Staff Attorney facilitates settlement discussions with both parties via telephone.  If you notify the Department to file a complaint with the Commission, I have been designated by the Director to CONCILIATE this case.

All settlement efforts are confidential.  If it is determined there is not a reasonable possibility of settlement, within 90 days after receipt of the notice of Substantial Evidence, I will prepare a complaint against Respondent, file it with the Commission and serve notice of such filing on all parties, pursuant to Section 7A-102(F) of the Act.  It is then the parties' responsibility to go forward with the case at the Commission.

**Or**

2)  Complainant may (within 90 days) file a complaint with the Commission.  If Complainant files a complaint with the Commission, Complainant must also give notice of such filing to the Department.

**Or**

3)  Complainant may commence a civil action in the appropriate state circuit court within ninety (90) days after receipt of this Notice.  The civil action should be filed in the circuit court in the county where the civil rights violation was allegedly committed.



EXHIBIT
2

Tomas A. Ramirez
Staff Attorney
(312) 814-6252

EEOC Form 161-B (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Deirdre Carroll
1350 Oak Hill Road
Lake Barrington, IL 60010

From: **Chicago District Office**
500 West Madison St
**Suite 2000**
Chicago, IL 60661

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 21B-2013-00175 | **Armernola P. Smith,**<br>**State & Local Coordinator** | **(312) 869-8082** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlik⌐ʲ̣hat the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*John P. Rowe/mjh*

**John P. Rowe,**
**District Director**

**November 19, 2013**

*(Date Mailed)*

Enclosures(s)

cc:

YMCA OF METRO
300 E Northwest Hwy
Des Plaines, IL 60016



EXHIBIT
3

## CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. #13 M 0321 - 02 | ☐ FEPA  ☑ IDHR | 2013CF2634 |

**Illinois Dept. of Human Rights** and EEOC
*State or local Agency, if any*

| NAME (*indicate Mr., Ms, or Mrs.*) | HOME TELEPHONE (*include area code*) |
|---|---|
| Mrs. Deirdre Carroll | (847) 907-1939 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 1350 Oak Hill Road, Lake Barrington, Illinois 60010 | Redacted |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*if more than one list below.*)

| Name YMCA of Metro Chicago | NUMBERS OF EMPLOYEES, MEMBERS  15+ | TELEPHONE NUMBER (Include Area Code)  (847) 296-3376 |
|---|---|---|

| STREET ADDRESS          CITY, STATE AND ZIP CODE | | COUNTY |
|---|---|---|
| 300 East Northwest Highway, Des Plaines, Illinois 60016 | | Cook |

| NAME | TELEPHONE NUMBER (*Include area code*) |
|---|---|
| | |

| STREET ADDRESS          CITY, STATE, AND ZIP CODE | | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (*check appropriate box(es)*) | DATE DISCRIMINATION TOOK PLACE  EARLIEST (ADEA/EPA) LATEST (ALL)  September, 2012 – December, 2012 |
|---|---|
| ☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN  ☑ RETALIATION   ☐ AGE   ☑ DISABILITY   ☐ OTHER (SPECIFY) | ☑ CONTINUING ACTION |

THE PARTICULARS ARE (*If additional space is needed, attached extra sheet (s)*):

Dept. of Human Rights
SWITCHBOARD
MAR 21 2013
RECEIVED

**See Attached**

OFFICIAL SEAL
NICOLA MICHEL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/08/16

| xx  I also want this charge filed with the The Equal Employment Opportunity Commission.  I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedure. | NOTARY (Necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that is true to the best of my knowledge, information and belief. |
| xx *Deirdre Carroll* 3/18/13  I declare under penalty that the foregoing is true and correct. | xx *Deirdre Carroll* xx 3/18/13  SIGNATURE OF COMPLAINANT          DATE |
| EXHIBIT  4 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (day, month, and year)  18th day of March 2013 |
| Notary Signature & | |

<u>Deirdre Carroll v. YMCA of Metro Chicago</u>

I.   **ISSUE/BASIS**

    A.    **RETALIATION FROM SEPTEMBER 24, 2012 UP TO AND INCLUDING DECEMBER 11, 2012 DUE TO OBJECTING TO SEXUAL HARASSMENT**

    B.    **PRIMA FACIE ALLEGATIONS**

1.    I was hired by the Respondent in January 2010.  My position was Membership Director, Lattof YMCA.

2.    At all times relevant hereto I met the reasonable performance expectations of my employer.

3.    I believe I was subjected to sexual harassment from at least January 2010 through May 2012 by my immediate supervisor, David Rodriguez, Director Lattof YMCA.

4.    Throughout my employment and specifically between December 2011 and May 2012, I complained about the sexual behavior and comments directed toward me on at least seven occasions to human resources, the Suburban North Group Vice President, the Regional Vice President of Human Resources, the Manager of Human Resources and the CEO/President of Respondent.

5.    From on or about May 22, 2012 until on or about July 2, 2012, I was on a leave of absence due to the stress I was experiencing in the workplace.  I then returned to work for approximately one week.

6.    During this time, I retained counsel who sent correspondence dated July 12, 2012 to Respondent disclosing the retention, stating that charges of discrimination were going to be timely filed, and the letter should be "considered as protected communication and activity on Ms. Carroll's behalf within the meaning of the state and federal anti-discrimination laws".

7.    Thereafter, I was placed on an unpaid leave of absence pending investigation of my claims.

8.    On August 17, 2012, my counsel sent additional correspondence to Respondent's senior counsel that stated that I had been subjected to sexual harassment/hostile work environment, ancestry/national origin discrimination, gender discrimination, and retaliation.

**Deirdre Carroll v. YMCA of Metro Chicago**

9.      I returned to work a second time on September 24, 2012.

10.    Upon and after my return, I was subjected to retaliatory conduct including but not limited to the following:

- 09/24/2012 immediately upon my return, I was presented with and placed on a Performance Improvement Plan which was relabeled a Performance Success Plan;
- 09/24/2012 Rodriguez sent an e-mail to me that stated I would be required to work seven days per week, evenings Monday through Friday and a total of 62 hours per week. My similarly situated counterparts were not required to work this many days, evenings or hours. I advised him that I would not be able to comply with the schedule the first week, for I had not been advised of the changes. I had pre-scheduled appointments. After I complained, on 9/28/2012 the schedule was reduced to six days per week (Fridays off), 52 hours per week, and evenings Monday through Thursday. However, I still needed to work every other Friday to do payroll. Again, my similarly situated counterparts were not required to maintain this type of schedule. My subsequent complaints to Rodriguez and Human Resources about this issue were never addressed.
- 09/25/2012 I overheard two employees having a conversation wherein they stated that they all knew "she" was suing the Y, and Rodriguez had told another employee, Tom March, that I had to be fired within three days. I reported this incident, and I received no response.
- The times at which I arrived and left began to be monitored despite my being an exempt employee. This had not been done prior to my complaints of sexual harassment.
- On or about 10/08/2012, I received four corrective actions and a first written warning;
- On 10/15/2012 I received a corrective action based on my not staying in the building until 8:30 p.m. every night my first week back despite my having stated I was incapable of doing so. In addition, I had worked in excess of forty hours that week. My similarly situated counterparts were not required to maintain these hours.
- I was excluded from giving a Director's report at meetings even though all other directors did so;
- On 10/16/12 my doctor drafted a letter which I presented to Rodriguez and Alicia Eddy, Human Resources Manager which stated that due to my stress and anxiety level, she recommended that I be allowed to work a five day per week, forty hour work week with two consecutive days off. My request denied.
- During this period, if a meeting was scheduled prior to the start of my work day, my schedule for the day was not adjusted accordingly.

<u>Deirdre Carroll v. YMCA of Metro Chicago</u>

- I learned that Rodriguez had informed some of my co-workers that I was suing the YMCA, and thereafter I was subjected to conduct including but not limited to the following:
  - o I was avoided;
  - o Conversations would cease when I entered a room;
  - o I was ignored in meetings;
  - o I was excluded from the YMCA's Halloween event;
- Rodriguez would go through my desk;
- I was informed by a member that one of my subordinates had stated to him "Dee is a f*cking nut job, and I am not f*cking working for her". I drafted a report regarding this communication, and I gave it to Eddy and Rodriguez. No action was taken.
- I was informed by a staff member that Rodriguez, Tom March (Director of Children's Day Care) and Giese (Building Superintendant Director) stated I was to be fired; I was not a "Y person", and I was perceived as "crazy" and "a nut job".

11. On or about October 11, 2012, I filed a charge complaining of sexual harassment, retaliation due to objecting to sexual harassment, and discrimination on the basis of my national origin, ancestry, sex (gender/female) in the Illinois Department of Human Rights. I also complained to Denise Lamb.

12. On or about October 16, 2012, I spoke to Marsha McKenna, Director of the Membership Cabinet for the YMCA about my schedule and by whom it had been set.

13. On or about October 18, 2012, I observed Rodriguez put his arm around a female employee, Melissa, who then appeared uncomfortable. I reported the incident to Eddy.

14. On or about October 22, 2012, Eddy and Rodriguez met with me to present me with write-ups. Later that day, I observed Rodriguez engaging in sexual, flirtatious conduct toward another female employee, Amanda. I reported his conduct to Eddy that evening.

15. On or about October 23, 2012, I received another corrective action for insubordination and unbecoming conduct. I disclosed I had Attention Deficit Hyperactivity Disorder.

Deirdre Carroll v. YMCA of Metro Chicago

16.    On or about October 24, 2012, I was informed by another employee that she and another co-worker had been approached by David Rodriguez who tried to persuade them to write a report about me stating I was abusive and disrespectful.

17.    On November 14, 2012, Mr. Grant Vreuls, member, became dizzy in the men's locker room due to the whirlpool. I did not personally tend to Mr. Vreuls because I was not medically certified, but I sent other medically certified employees to do so.

18.    On or about November 28, 2012, Rodriguez put a member's comment card containing a complaint about "naked shaving at sinks"… "genitals swinging 4 inches from where I wash my face…" in my box.

19.    On or about December 11, 2012, I was terminated. The stated reason was "the incident with Mr. Grant Vreuls".

20.    I believe I have been subjected to retaliation for complaining of sexual harassment in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act, as amended.

## II.    ISSUE/BASIS

### A.    TERMINATION ON DECEMBER 11, 2012 IN RETALIATION FOR OBJECTING TO SEXUAL HARASSMENT

### B.    PRIMA FACIE ALLEGATIONS

1.    Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

2.    I believe I was terminated in retaliation for complaining of sexual harassment in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act, as amended.

__Deirdre Carroll v. YMCA of Metro Chicago__

III.   **ISSUE/BASIS**

    A.   **RETALIATION FROM SEPTEMBER 24, 2012 UP TO AND INCLUDING DECEMBER 11, 2012 DUE TO OBJECTING TO NATIONAL ORIGIN DISCRIMINATION**

    B.   **PRIMA FACIE ALLEGATIONS**

    1.   Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

    2.   I believe I have been subjected to retaliation for complaining of national origin discrimination in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act as amended.

IV.   **ISSUE/BASIS**

    A.   **TERMINATION ON DECEMBER 11, 2012 IN RETALIATION FOR OBJECTING TO NATIONAL ORIGIN DISCRIMINATION**

    B.   **PRIMA FACIE ALLEGATIONS**

    1.   Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

    2.   I believe I was terminated in retaliation for complaining of national origin discrimination in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act, as amended.

V.   **ISSUE/BASIS**

    A.   **RETALIATION FROM SEPTEMBER 24, 2012 UP TO AND INCLUDING DECEMBER 11, 2012 DUE TO OBJECTING TO SEX (GENDER/FEMALE) DISCRIMINATION**

    B.   **PRIMA FACIE ALLEGATIONS**

    1.   Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

**Deirdre Carroll v. YMCA of Metro Chicago**

    2.    I believe I have been subjected to retaliation for complaining of Sex (gender/female) discrimination in violation of the Illinois Human Rights Act and Title VII of the Civil Rights, Act as amended.

**VI.    ISSUE/BASIS**

    **A.    TERMINATION ON DECEMBER 11, 2012 IN RETALIATION FOR OBJECTING TO SEX (GENDER/FEMALE) DISCRIMINATION**

    **B.    PRIMA FACIE ALLEGATIONS**

    1.    Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

    2.    I believe I was terminated in retaliation for complaining of sex (gender/female) in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act, as amended.

**VII.    ISSUE / BASIS**

    **A.    RETALIATION FROM SEPTEMBER 24, 2012 UP TO AND INCLUDING DECEMBER 11, 2012 DUE TO OBJECTING TO DISCRIMINATION ON THE BASIS OF MY ANCESTRY**

    **B.    PRIMA FACIE ALLEGATIONS**

    1.    Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

    2.    I believe I have been subjected to retaliation for complaining of ancestry discrimination in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act, as amended.

<u>Deirdre Carroll v. YMCA of Metro Chicago</u>

VIII.   ISSUE/BASIS

     A.    **TERMINATION ON DECEMBER 11, 2012 IN RETALIATION FOR OBJECTING TO DISCRIMINATION ON THE BASIS OF MY ANCESTRY**

     B.    **PRIMA FACIE ALLEGATIONS**

     1.    Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

     2.    I believe I was terminated in retaliation for complaining of ancestry in violation of the Illinois Human Rights Act and Title VII of the Civil Rights Act as amended.

IX.   ISSUE/BASIS

     A.    **DISCRIMINATION ON THE BASIS OF MY DISABILITY POST TRAUMATIC STRESS DISORDER BEGINNING IN SEPTEMBER 2012 AND CONTINUING UNTIL DECEMBER 2012**

     B.    **PRIMA FACIE ALLEGATIONS**

     1.    Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

     2.    I have an actual or perceived disability within the meaning of the Illinois Human Rights Act 1-103(I) and the Americans with Disabilities Act.

     3.    I was diagnosed with Post Traumatic Stress Disorder in the Spring of 2012. I disclosed my diagnosis to Respondent at that time.

     4.    I was at all times relevant hereto, performing my job duties in a manner which met the reasonable expectations of Respondent.

     5.    In May 2012, I requested an accommodation in the form of a leave of absence from work as a result of my disability.

     6.    Upon my return, I was subjected to the foregoing hostile and discriminatory actions.

**Deirdre Carroll v. YMCA of Metro Chicago**

7.    I believe I have been subjected to discrimination on the basis of my
disability, Post Traumatic Stress Disorder in violation of the Illinois
Human Rights Act and the Americans with Disabilities Act.

X.    **ISSUE/BASIS**

A.    **RETALIATION FOR REQUESTING ACCOMODATION FOR
ACTUAL OR PERCEIVED DISABILITY STARTING IN
SEPTEMBER 2012 AND CONTINUING UNTIL DECEMBER 2012**

B.    **PRIMA FACIE ALLEGATIONS**

1.    Complainant restates and realleges paragraphs 1 through 20 of IAB above
though fully stated herein.

2.    I have an actual/perceived disability within the meaning of the Human
Rights Act §1-103(I) and the Americans with Disabilities Act.

3.    I was at all times relevant hereto performing my job duties in a manner
which met the reasonable expectations of Respondent.

4.    My actual or perceived handicap was unrelated to my ability to perform
my duties.  My work was good.

5.    I believe I was subjected to retaliation on the basis of my disability, Post
Traumatic Stress Disorder.

6.    These actions followed my notice to Respondent of my need for
accommodation within such a short period of time that I have no
alternative but to believe that it was the basis for my termination.

7.    Respondent retaliated against me when it subjected to the foregoing
actions for utilizing my rights under the Illinois Human Rights Act and the
Americans with Disabilities Act by taking a leave of absence. I believe
these actions were taken against me due to my actual or perceived
handicap/disability heart attack/heart disease in violation of the Illinois
Human Rights Act and the Americans with Disabilities Act.

8

**Deirdre Carroll v. YMCA of Metro Chicago**

XI.    **ISSUE/BASIS**

    A.    **FAILURE TO ACCOMMODATE (DISCHARGED) ON DECEMBER 31, 2011 BECAUSE OF MY ACTUAL OR PERCEIVED PHYSICIAL HANDICAP / DISABILITY, POST TRAUMATIC STRESS DISORDER**

    B.    **PRIMA FACIE ALLEGATIONS**

1.    Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

2.    I have an actual or perceived disability as defined by the Human Rights Act §1-103(I) and the Americans with Disabilities Act.

3.    Respondent became aware of my actual or perceived handicap/disability, Post Traumatic Stress Disorder in or around May 2012.

4.    In May 2012, I requested a leave of absence due to my Post Traumatic Stress Disorder.

5.    My actual or perceived handicap was unrelated to my ability to perform my duties.  My work was good.

6.    When I returned to work, I was subjected to differences in the terms and conditions of my employment.

7.    In October 2012, I requested an accommodation in that I asked for a reduction in my overtime hours.

8.    My request was not granted.

9.    I was terminated on December 11, 2012.

10.    These actions followed my notice to Respondent of my need for accommodation within such a short period of time that I have no alternative but to believe that it was the basis for my termination.

**Deirdre Carroll v. YMCA of Metro Chicago**

11.    Respondent retaliated against me when it terminated me for requesting an accommodation under the Illinois Human Rights and the Americans with Disabilities Act by taking a leave of absence. I believe these actions were taken against me due to my actual or perceived handicap/disability Post Traumatic Stress Disorder in violation of the Illinois Human Rights Act and the Americans with Disabilities Act.

**XII.    ISSUE/BASIS**

**A.    DISCRIMINATION (LACK OF ACCOMMODATION) – OCTOBER 2012 FOR MY DISABILITY ATTENTION DEFICIT HYPERACTIVITY DISORDER**

**B.    PRIMA FACIE ALLEGATIONS**

1.    Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

2.    I have an actual/perceived disability within the meaning of the Human Rights Act §1-103(I) and the Americans with Disabilities Act.

3.    I was at all times performing my job duties in a satisfactory manner.

4.    My actual or perceived handicap was unrelated to my ability to perform my duties.  My work was good.

5.    I disclosed my disability Attention Deficit Hyperactivity Disorder to Respondent in October 2012.

6.    At that time, I requested an accommodation in the form of asking if I could take notes at meetings, record my meetings take documents from my meetings, have additional time to consider what was said in meetings before responding.

7.    My accommodation requests were denied.

**Deirdre Carroll v. YMCA of Metro Chicago**

8.  I believe I have been subjected to discrimination (lack of accommodation) on the basis of my disability, Post Traumatic Stress Disorder in violation of the Illinois Human Rights Act and the Americans with Disabilities Act.

## XIII. ISSUE/BASIS

**A.  RETALIATION (DISCHARGE) – DECEMBER 11, 2012 DUE TO MY ACTUAL OR PERCEIVED DISABILITY ATTENTION DEFICIT HYPERACTIVITY DISORDER**

**B.  PRIMA FACIE ALLEGATIONS**

1.  Complainant restates and realleges paragraphs 1 through 20 of IAB above though fully stated herein.

2.  I have an actual/perceived disability within the meaning of the Human Rights Act §1-103(I) and the Americans with Disabilities Act.

3.  I was at all times performing my job duties in a satisfactory manner.

4.  My actual or perceived handicap was unrelated to my ability to perform my duties. My work was good.

5.  I disclosed my disability Attention Deficit Hyperactivity Disorder to Respondent in October 2012.

6.  At that time, I requested an accommodation in the form of asking if I could take notes at meetings, record my meetings take documents from my meetings, have additional time to consider what was said in meetings before responding.

7.  My accommodation requests were denied, and instead Respondent chose to terminate my on December 11, 2012.

8.  These actions followed my notice to Respondent of my need for accommodation within such a short period of time that I have no alternative but to believe that it was the basis for my termination.

9.  I believe I have been subjected to discrimination (lack of accommodation) on the basis of my disability, Attention Deficit Hyperactivity Disorder in violation of the Illinois Human Rights Act and the Americans with Disabilities Act.